UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                   )
TODD W. WILLIAMS, pro se,          )
                                   )
          Plaintiff,               )
                                   )    C.A. No. 05-40149-FDS
v.                                 )
                                   )
GUY W. GLODIS,                     )
                                   )
          Defendant.               )
                                   )
```

## SPECIAL APPEARANCE AND RESPONSIVE PLEADING

### I.   Introduction

On August 30, 2005 plaintiff TODD H. WILLIAMS filed a Complaint against defendant GUY W. GLODIS, the Superintendent of the Worcester County Jail and House of Correction.  Notwithstanding the plaintiff's failure to file the six-month prison account statement required by 28 U.S.C. § 1915(a), the Court (Zobel, J.) ordered that the defendant "file a responsive pleading setting forth the plaintiff's medical history, current medical condition, and treatment program by September 12, 2005."

Without waiving his special appearance, but relying thereon, and without submitting itself to the jurisdiction of the court, the defendant files the attached in response to the Court's Order.  It is submitted that the attached

-2-

amply documents that plaintiff has no Eighth Amendment
claim which might justify the Court in even conditionally
ignoring the applicable six-month prison account statement
required by 28 U.S.C. § 1915(a) and no further action by
the Court need be taken.  Defendant and the Worcester
County Jail and House of Correction have not been
deliberately indifferent to plaintiff's needs. To the
contrary, plaintiff has been seen by medical personnel on
numerous occasions, provided medication, crisis
intervention and therapy.  Plaintiff's claims that he has
not been provided with certain unspecified forms of
treatment, or provided with a doctor/inmate ratio of more
favorable proportion, would not amount to cruel and unusual
punishment.

## II.  Applicable Law

An inmate "deserves adequate medical care, [but] he
cannot insist that his institutional host provide him with
the most sophisticated care that money can buy." U.S. v.
DeCologero, 821 F.2d 39, 42 (1st Cir. 1987).  Disagreements
about the quality and the source of treatment simply do not
rise to an Eighth Amendment violation. Ferranti v. Moran,
618 F.2d 888, 890-891 (1st Cir. 1980); Jackson v. Fair, 846
F.2d 811, 817 (1st Cir. 1988) ("Although the Constitution
does require that prisoners be provided with a certain

-3-

minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice"); Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987); Layne v. Vinzant, 657 F.2d 468, 471 (1st Cir. 1981).

Quite apart from objective considerations, plaintiff has not alleged, and cannot show, that the defendant has acted with the subjective state of mind or intent necessary for a "deliberate indifference" claim. The requisite state of mind or intent is similar to criminal recklessness and requires actual knowledge of impending harm which is easily preventable. Dias v. Vose, 885 F.Supp. at 57, citing, Farmer v. Brennan, __ U.S. __, 114 S.Ct. 1970, 1978-1979, (1994). See Desrosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)(a claim of deliberate indifference requires proof that the defendant had a culpable state of mind and intended wantonly to inflict pain). While state of mind issues generally are not susceptible to summary judgment or the like, "where there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional or where there is no evidence of acts or omissions so dangerous (in respect to health or safety) that a defendant's knowledge of a large risk can be inferred, summary judgment is appropriate." Dias v. Vose, 865 F.Supp at 57, citing Torraco v. Maloney, 923 F.2d 231,

234 (1st Cir. 1991)(granting summary judgment in favor of
defendant prison officials in prison suicide case where
prison officials had provided inmate with access to mental
health services and there was no evidence of acts or
omissions so dangerous that knowledge or risk could be
inferred).

Particularly in this regard, plaintiff cannot
establish the existence of an essential element of his case
because he has not submitted any evidence in the form of
competent medical testimony demonstrating that the care
being rendered by the Worcester County Jail and House of
Correction is inadequate, let alone conscience-shocking.
See Dulaney v. Carnahan, 132 F.3d 1234, 1240 (8th Cir.
1997)(in the face of medical records indicating that
treatment was provided and physician affidavits indicating
that the care provided was adequate, an inmate cannot
create a question of fact by merely stating that she did
not feel that she received adequate medical treatment).
Plaintiff's case amounts to no more than an invitation for
the Court to "second guess" the judgment of mental health
professionals. Layne v. Vinzant, 657 F.2d at 331. Since
his claim of inadequate mental health is founded only on
"improbable inferences and unsupported speculation," Woods

v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994), no further action should be ordered by the Court.

Moreover, even if plaintiff had produced medical evidence documenting the provision of inadequate care, he cannot show that the defendant or the Worcester County Jail and House of Correction have any role in determining what care individual clinicians should provide. The provision of clinical care is a matter of professional judgment. As Judge Aldrich forcefully admonished in a unanimous opinion reversing a judgment against supervisory prison officials in a suit involving medical care claims,

> we do not see how the Commissioner [of Correction], or the superintendent of a prison as large as those involved here, can be held responsible for the individualized [as opposed to prison-wide] complaints of every prisoner in his charge, except on the basis of actual notice of facts sufficient to put him on inquiry.

Layne v. Vinzant, 657 F.2d at 471 n.3(citations omitted). The defendant is a prison official, not a medical professional. As such, he is entitled to rely upon the judgment of medical professionals. Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)(prison's treatment director and warden could not be held liable for medical staff's diagnostic decision because they lacked medical

expertise); <u>McCracken v. Jones</u>, 562 F.2d 22, 24 (10th Cir. 1977).

## III. Conclusion

The facts are undisputed that plaintiff is receiving ongoing mental health care and management from mental health staff. In the absence of defendant's direct participation or actual notice to him that plaintiff is suffering serious harm as a result of constitutionally inadequate mental health care, it is respectfully submitted that this Court cannot properly entertain further action against the defendant.  Indeed, an order that plaintiff be transferred to another facility, or provided with care that his clinicians have not deemed necessary, would cause the defendant and the Worcester County Jail and House of Correction irreparable harm by diminishing their authority to place prisoners in the appropriate correctional setting, and it would encourage other prisoners to act out inappropriately in an attempt to manipulate their own placement and treatment.

DEFENDANT GUY W. GLODIS,

By his Attorneys,

THOMAS F. REILLY
Attorney General


/s/Charles M. Wyzanski
Charles M. Wyzanski
Assistant Attorney General
B.B.O. No. 536040
One Ashburton Place
Boston, MA. 02108
Tel.No. (617) 727-2200


CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail (by hand)
on __9/13/05__



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

September 13, 2005

Office of the Clerk
United States District Court
Harold D. Donahue Federal Bldg.
  and Courthouse
595 Main Street
Worcester, Massachusetts 01608
      ATT'N: Kathy

        Re:  Williams v. Glodis
             USDC C. A. No. 05-40149-FDS

Dear Kathy:

     Per our telephone conversation of today, I am confirming
that the enclosed document with its attachment was e-filed
yesterday.  Apparently, it did not all go through and I am asking
that you substitute the enclosed.  (The Special Appearance And
Responsive Pleading has been corrected in three places but
otherwise is identical to the original.)  A copy is being mailed
to the plaintiff.

     Thank you for your assistance in this matter.

                        Very truly yours,

                        Charles M. Wyzanski
                        Assistant Attorney General

Enclosure
cc:  Todd W. Williams, pro se



Vision, Values & Innovation

One Clarks Hill, Suite 305 • Framingham, MA 01702 • (508) 628-6300 • 1-800-479-7768
Fax: (508) 626-0326 • TTY (508) 628-6303
www.AdvocatesInc.org

Daniel M. Weir
Chair

Robert J. Harrington
Vice Chair

Kay Hodge
2nd Vice Chair

Michael Sheridan
Treasurer

Hon. Edward L. Burke
Clerk

Timothy P. Lee
Vice Clerk

William J. Taylor
President & CEO

Christopher Gordon, M.D.
VP & Medical Director

**Memorandum**

**To: Deputy Superintendent Jeffrey Turco, Esq**
**From: Christopher Gordon, MD**
**RE: Psychiatric Status of Inmate Todd Williams, ID: 17847**
**Date: September 7, 2005**

At your request, I have prepared this report on the current mental health status of the above-named inmate, in response to the order from Judge Zobel of 9/1/05 to set forth the inmate's medical history, current medical condition, and treatment program.

For the record, I am the Medical Director of Advocates, Inc., the independent provider of mental health services at the Worcester County Jail and House of Correction. I am Board Certified in Psychiatry; a Distinguished Fellow of the American Psychiatric Association; and Assistant Clinical Professor of Psychiatry at Harvard Medical School. I attach my resume.

**Summary of Clinical History**

Mr. Williams is a 27 year old man incarcerated at the Worcester County Jail and House of Correction since January 2005, serving a one-year sentence for Violation of Probation from a 2001 conviction on the charge of impersonating a police officer. He has an outstanding warrant on the charge of practicing medicine under a false name.

Mr. Williams has given various versions of his background, and has been demonstrated to be an unreliable historian; for example, he has told evaluators that he has a nursing degree from Northeastern University, while his mother has reported that he only finished sixth grade. However, he has consistently reported that his childhood was marked by physical and emotional abuse, both by his parents, whom he has described as both addicted to drugs, and by boyfriends of his mother after his parents divorced. He was reportedly in DSS custody from the ages of 7 – 17, and was reported to have had counseling at age 12, and may have had a psychiatric hospitalization at around that same time.



**Community Counseling**
Marlborough Commerce Center
340 Maple Street, Suite 400
Marlborough, MA 01752
T: (508) 485-9300 • F: (508) 485-6904
27 Hollis Street, 1st Floor
Framingham, MA 01702
T: (508) 935-0769 • F: (508) 661-0232

**First, We Listen.**

**Emergency Services**
27 Hollis Street, 1st Floor
Framingham, MA 01702
T: (508) 872-3333 • F: (508) 875-2600

**Waltham Office**
721 Main Street, Suite 302/303
Waltham, MA 02451
T: (781) 893-5110 • F: (781) 893-5644

**Ashland Office**
250/290 Eliot Street
Ashland, MA 01721
T: (508) 881-6494 • F: (508) 881-7137

Memorandum to Deputy Superintendent Jeffrey Turco, Esq., page 2

However, he had no psychiatric hospitalizations in the years from age 12 to age 27, when he arrived at the WCJHC. He underwent a mental health evaluation at that time, and informed the evaluator that he was not under the care of a psychiatrist, and that his primary care physician was prescribing an antidepressant, Celexa, for depression and mood swings. He was considered at the time of his admission to meet criteria for Mood Disorder, Not Otherwise Specified, and Alcohol Dependence. He was subsequently seen by psychiatrist Thomas Weiss, MD on 2/17/05, and Celexa was continued.

Mr. Williams seemed to be adjusting reasonably well to incarceration, and was placed shortly after admission, at his request, and without incident, in the protective custody unit (K-Block). On 5/27/05, he was noted to be crying and upset after he was moved to the J Block for disciplinary reasons, and threatened to hang himself if he had to remain in the J Block. On June 4, he did attempt to hang himself, using a rolled up sheet. Although there were no physical consequences from his action, and the seriousness of his attempt was not ascertainable, he was immediately placed on suicide watch. He was immediately evaluated by mental health staff and arrangements were made for an evaluation by a Forensic Psychologist.

On 6/6/05, Mr. Williams was evaluated by Hanya H. Bluestone, Ph.D., D.F.P. Her report is attached (Attachment 1). It was Dr. Bluestone's opinion that Mr. Williams was presenting significant symptoms of mental illness (depressed mood, restricted affect, impaired sleep, command auditory hallucinations, suicidal thoughts, and impaired insight and judgment). She also noted that Mr. Williams appeared to be highly motivated to avoid disciplinary action at WCJHOC, noting that he "has demonstrated that he is willing to up the ante with his behavior if necessary resulting in a potentially lethal behavior. Whereas malingering cannot be ruled out at this time, Mr. Williams has reported that his symptoms are worsening and he is now experiencing command hallucinations." Dr. Bluestone also noted Mr. Williams' history of anti-social behavior, including previous conviction for bomb threats, and his having acknowledged a plan to harm correctional officers. She therefore recommended that he be considered for transfer to the strict security of the Bridgewater State Hospital.

At Bridgewater State Hospital, a comprehensive evaluation was conducted by Gregg A. Belle, Ph.D. His report is attached (Attachment 2). Of note is that at Bridgewater, off of psychiatric medications, all of the psychiatric symptoms abated, and largely resolved. Quoting Dr. Belle's report: "On June 9, Mr. Williams denied any suicidal ideation or feeling depressing (sic), describing his mood as 'great'. On June 13, Mr. Williams was transferred to a less restrictive admissions/observation unit (B-2). On June 15, his treating psychiatrist reported 'Feels well, not depressed, no suicidal thoughts. Can't account for prior suicide attempt except to say he had "idle thoughts." Cheerful, smiling, superficial, no signs of depression, engages easily…does not want to continue Prozac.'"

Dr. Belle concluded that: "In my opinion, Mr. Williams does not presently suffer from a mental illness as defined by relevant Department of Mental Health regulations. It is my opinion and that of his clinical treatment team that Mr. Williams does not require

Memorandum to Deputy Superintendent Jeffrey Turco, Esq., page 3

continued inpatient psychiatric hospitalization at this time. It is my opinion that the behaviors precipitating his transfer to BSJ were more a function of his maladaptive personality style and desire to effect a transfer to the Shattuck Hospital for psychiatric care, improve his chances for parole, and avoid possible sanctions at Worcester. While it is likely that he has trouble coping with the situational stressors in jail (e.g., receiving a D-Board), it is my opinion that he can be safely managed in a penal environment at this time as he has during previous periods of incarceration. Until just a few days ago, Mr. Williams repeatedly stated that he is "not seriously mentally ill," nor required the strict security of BSH."

Dr. Belle continued: "In my clinical opinion, Mr. Williams has severe underlying character pathology best characterized as Antisocial Personality Disorder marked by borderline features. His maladaptive personality style often contributes to his disruptive, deceptive, and provocative behavior. Specifically, he has a pattern of behaving and relating to others in an entitled manner in which he often threatens self-harm and/or engages in self-injurious behaviors when his needs and desires are not met...Given Mr. Williams' maladaptive personality style, difficulty accepting when things do not go as he hopes, and possible sanctions at Worcester, it is likely that he will continue to engage in threatening, disruptive, and provocative behaviors upon return to jail...If mental health staff determines that his clinical status remains unchanged and that his behavior is still deemed not to be the result of a mental illness, then his behavior can be managed through behavioral interventions (e.g., security watch or restrictions placed on his privileges). It is my opinion that responding to such parasuicidal behaviors by transferring him to a psychiatric hospital is likely to be counterproductive and result in an increase of these parasuicidal and manipulative behaviors."

Since his return from BSH, WCJHOC mental health staff arranged for Mr. Williams to be evaluated by the Department of Mental Health, to see if he would qualify for DMH services upon completion of his sentence. Like Dr. Belle, the DMH evaluator concluded that Mr. Williams does not meet criteria for having a major mental illness as defined by DMH at the current time. Her report is attached (Attachment 3).

**Current Condition and Treatment Program**

Since his return from Bridgewater State Hospital, Mr. Williams has continued to be monitored by mental health staff. He is currently prescribed perphenazine 4 mg BID; Cogentin 0.5 mg/d; and Remeron 45 mg/d. He has been evaluated by a psychiatrist on six occasions since his initial evaluation by Dr. Weiss. He was subsequently re-evaluated by Dr. Weiss on 3/3/05, 4/2/05, and 5/8/05, when Celexa was changed to Remeron to assist with sleep. He was also seen by me, on 6/1/05; I added Risperdal 1 mg BID, to assist with the inmate's reported thoughts of self harm; and on 7/13/05, when Risperdal was changed to perphenazine. He has since then been treated by Dr. Weiss, who saw him on 8/9/05, who adjusted the perphenazine dose. While the evaluation at BSH would indicate that it is questionable whether medication plays any significant role in alleviating his symptoms or distress, these medications have been continued, at his request, in hopes of affording him some relief and greater emotional stability.

Memorandum to Deputy Superintendent Jeffrey Turco, Esq., page 4

Upon his return from Bridgewater State Hospital, Mr. Williams continued to threaten suicide unless he was transferred to a psychiatric facility, as Dr. Belle had anticipated. His behavior was managed by maintaining him on a suicide watch, under close observation, from July 5, 2005, when he returned from Bridgewater, to July 22, 2005. He was placed again on suicide watch on July 28 until August 24, 2005, again because of a threat to hang himself if he was not transferred to a psychiatric facility. The opinion of the mental health staff at that time was that these threats represent manipulative, deliberate behavior, not motivated by major mental illness; in keeping with the recommendations of Dr. Belle, this behavior has been managed by restriction of privileges, close observation, and supportive, consistent mental health support from Sandra Fallon, LICSW. The mental health staff of WCJHOC concur with Dr. Belle that transferring Mr. Williams in response to these threats is likely to increase these manipulative and para-suicidal behaviors.

These behaviors resolved as of August 24, 2005, and since then Mr. Williams has been again housed on the K Block, and has been stable, without suicidal threats or other behavioral problems since that time. We anticipate that if Mr. Williams is frustrated, or faces disciplinary action in the future that these threats may recur; should that occur, he will be re-evaluated by mental health staff, and if the staff concludes that this behavior is para-suicidal, manipulative and deliberate – as has been the case recently – the staff will continue to implement the plan of Suicide Watch, close observation and support. If the mental health staff concludes that Mr. Williams is then suffering from more serious psychiatric illness, the mental health staff of WCJHOC will adjust the treatment plan as necessary, including consideration of re-evaluation at Bridgewater State Hospital, if necessary.

**Conclusions and Recommendations**

1. Mr. Williams' psychiatric condition has been thoroughly evaluated. While he may have Post-Traumatic Stress Disorder as a result of childhood abuse, most of his behavioral and emotional difficulties are better explained by Antisocial Personality Disorder with Borderline features. Subsequent to the increase in his reported symptoms following his Disciplinary Board in May, a thorough evaluation led to the recommendation for a transfer to Bridgewater State Hospital for more comprehensive evaluation in a psychiatric facility.

2. The comprehensive evaluation at Bridgewater State Hospital concluded that the inmate does not currently suffer from a major mental illness that would require intensive psychiatric treatment in a specialized facility.

3. The comprehensive evaluation at Bridgewater State Hospital concluded that much of the inmate's self-injurious behavior and other reported symptomatology was directed at avoiding disciplinary action at the WCJHOC, as well as effecting a transfer to an alternative institution, and was a result of the inmate's Antisocial Personality Disorder, rather than due to a major mental illness.

4. The treatment he is receiving currently at the Worcester County Jail and House of Correction is appropriate to his condition. In my professional opinion, the mental

Memorandum to Deputy Superintendent Jeffrey Turco, Esq., page 5

health services which are being provided at the WCJHOC are more than adequate to meet Mr. Williams' mental health needs at this time. The combination of psychiatric medications, used to alleviate some of his distress, supportive intervention by the mental health staff; and behavioral interventions, including suicide watches, restriction of privileges, and transfer to higher security environments when needed are appropriate to his condition.

Respectfully submitted,

Christopher Gordon, MD

# CURRICULUM VITAE

**Name:** Christopher David Gordon

**Office Address:** One Clarks Hill, Suite 305, Framingham, Massachusetts 01702

**Home Address:** 82 Winter Street, Natick, Massachusetts 01760

**Email:** chrisgordon@advocatesinc.org          **FAX:** 508-861-0933

**Place of Birth:** Washington, DC

**Education:**

| | |
|---|---|
| 1967-1972 | BA, Antioch College, Yellow Springs, Ohio |
| 1972-1975 | MD, University of Maryland School of Medicine, Baltimore, Maryland |
| 1972-1975 | Combined-Accelerated Program in Psychiatry, University of Maryland School of Medicine, Baltimore, Maryland |

**Postdoctoral Training:**

| | |
|---|---|
| 1975-1976 | Medical internship under auspices of University of Maryland School of Medicine, Department of Medicine at Good Samaritan Hospital, Baltimore, Maryland |
| 1976-1979 | Resident in Psychiatry, Massachusetts General Hospital and Harvard Medical School, Boston, Massachusetts |
| 1992 | Harvard Law School Program in Negotiation, directed by Professor Roger Fisher |
| 2001 | Basic Crisis Negotiations, sponsored by the Federal Bureau of Investigation, Instructor: S.A. Liane McCarthy |

**Licensure and Certification:**

| | |
|---|---|
| 1976 | Massachusetts Licensure |
| 1975 | National Board of Medical Examiners Certificate |
| 1981 | American Board of Psychiatry and Neurology |

Curriculum Vitae, Christopher David Gordon, page 2

**Academic appointments:**

| | |
|---|---|
| 2001 – | Assistant Clinical Professor of Psychiatry, Massachusetts General Hospital, Harvard Medical School |
| 1985 – 2001 | Instructor in Psychiatry at the Massachusetts General Hospital, Harvard Medical School. |
| 1979-1985 | Clinical Instructor in Psychiatry at the Massachusetts General Hospital, Harvard Medical School |
| 1976 – 1979 | Clinical Fellow in Psychiatry at the Massachusetts General Hospital, Harvard Medical School, Boston, Massachusetts |
| 1987 – 1988 | Clinical Instructor in Psychiatry, Boston University School of Medicine, Boston, Massachusetts |
| 1979 – 1980 | Clinical Instructor in Psychiatry, Boston University School of Medicine, Boston, Massachusetts |

**Hospital or Affiliated Institution Appointments:**

| | |
|---|---|
| 1995 – | Staff psychiatrist, Metrowest Health System |
| 1992 –1995 | Medical Director, AtlantiCare Hospital, Lynn, Massachusetts |
| 1988 –1992 | Medical Director, Human Resource Institute, Brookline, Massachusetts. |
| 1987 –1988 | Clinical Director, Human Resource Institute, Brookline, Massachusetts. |
| 1979 –1985 | Clinical Assistant in Psychiatry at the Massachusetts General Hospital, Boston, Massachusetts. |
| 1985 – | Assistant Psychiatrist at the Massachusetts General Hospital, Boston, Massachusetts. |
| 1979 –1981 | Staff Psychiatrist, Westwood Lodge Hospital, Westwood, Massachusetts. |

**Hospital and Health Care Organization Service Responsibilities:**

| | |
|---|---|
| 1992-1995 | Board of Directors, Union Medical Practice Associates |
| 1992-1995 | Board of Directors, Essex County IPA |
| 1991-1995 | Member, Mental Health External Appeals Consultant Panel, Blue Cross/Blue Shield of Massachusetts |

2

Curriculum Vitae, Christopher David Gordon, page 3

## Major Administrative Responsibilities:

2004 –    Vice President, Clinical Services, Advocates, Inc., Framingham, Massachusetts

1997- 2004    Vice President, Behavioral Health, Advocates, Inc., Framingham, Massachusetts

1996- 2003    Director, Behavioral Health Division, Advocates, Inc., Framingham, Massachusetts.

1995-    Medical Director, Advocates, Inc., Framingham, Massachusetts.

1992 - 1995    Medical Director, AtlantiCare Medical Center, Lynn, Massachusetts.

1987 - 1992    Medical Director, Human Resource Institute, Brookline, Massachusetts.

1985 -1987    Director, Acute Psychiatric Service, Massachusetts General Hospital, Boston, Massachusetts.

1983 - 1985    Co-Director, Acute Psychiatry Service, Massachusetts General Hospital, Boston, Massachusetts.

1981 - 1983    Consulting Psychiatrist, Internal Medical Associates, Massachusetts General Hospital, Boston, Massachusetts.

## Major Committee Assignments

1992 - 1995    Chairman, Inpatient Psychiatry Committee, Massachusetts Psychiatric Society
1988 - 1995    Member, Inpatient Psychiatry Committee, Massachusetts Psychiatric Society
1987 - 1992    Chairman, Utilization Review Committee, Human Resource Institute, Brookline, Massachusetts
1987 - 1992    Chairman, Pharmacy and Therapeutics Committee, Human Resource Institute, Brookline, Massachusetts
1987 - 1992    Secretary, Medical Staff, Human Resource Institute, Brookline, Massachusetts
1983 - 1987    Member, Residency Training Committee, Massachusetts General Hospital
1982 - 1985    Member, Psychotherapy Task Force, Massachusetts General Hospital

## Professional Societies

1983  –    American Psychiatric Association
1983  –    Massachusetts Medical Society

3

Curriculum Vitae, Christopher David Gordon, page 4

| | |
|---|---|
| 1983 - | Massachusetts Psychiatric Society |
| 1973 - | American Medical Association |

## Community Service Related to Professional Work

| | |
|---|---|
| 1995 - | Member, Core Group of Non-Profit Organizations, Metrowest Area |
| 1995 - | Speaker for Department of Mental Health on various topics in psychiatry |
| 1995- | Member, Department of Mental Health task force on early mortality in persons with severe and persistent mental illness |
| 1996- | Member Clinical Advisory Group, Massachusetts Behavioral Health Partnership |
| 2000 - | Liaison with Framingham and Natick Police Forces regarding Community/Police interaction for mentally ill citizens |
| 2001 - | Consultant, Framingham Police Department, Crisis Negotiation Team |
| 2001 - | Consultant, Massachusetts State Police Crisis Response Team |

## Editorial Boards

| | |
|---|---|
| 1979 - 1981 | Contributing Editor for Psychiatry, The New Physician. |

## Awards and Honors

| | |
|---|---|
| 2003 | Distinguished Fellow, American Psychiatric Association |
| 1979 | Chief Resident, Psychiatric Inpatient Service, Massachusetts General Hospital, Boston, Massachusetts |

## Part II: Research, Teaching and Clinical Contributions

### A. Narrative Report

Since 1979, I have been actively involved in teaching in the Residency Training Program of the Massachusetts General Hospital, and for the past three years in the Combined Residency Program at Massachusetts General and McLean Hospitals. In recent years, my teaching has focused primarily on the subject of Psychodynamic Formulation and its application to short-term psychotherapy. I have taught a course on this subject as part of the Core Curriculum of the Residency Program for approximately 15 years. Until three years ago, from 1979, I also served as a psychotherapy supervisor.

Curriculum Vitae, Christopher David Gordon, page 5

I had a major teaching responsibility as the Director of the Psychiatric Emergency Service at Massachusetts General Hospital from 1982 –1987, where I developed my love of crisis intervention, a subject I have frequently taught since to residents and at post-graduate courses.

I have also taught principles of effective interviewing over this same period of time, and lecture annually in the Postgraduate Review of Psychiatry course on this subject. Over the years, I have presented numerous lectures in the Harvard postgraduate courses and other forums on a wide variety of clinical subjects, but primarily in the arena of crisis intervention, emergency psychiatry, clinical negotiation and formulation

**B. Funding Information**

None

**C. Report of Current Research Activities**

None.

**D. Report of Teaching**

1. Local contributions
    a. Medical School Courses
        i. 1983 - 1987      Coordinator and Instructor, clerkship in emergency psychiatry, Harvard Medical School, at the Acute Psychiatry Service, Massachusetts General Hospital, Boston, MA. This involved Harvard Medical Students rotating on the Acute Psychiatry Service, usually two students at a time and involved approximately six hours per week of teaching and preparation.
        ii. 1987 - 1992      Instructor, Boston University medical student clerkship in psychiatry, HRI Hospital. This involved demonstrating interviewing techniques, and observing and critiquing evaluations by third-year medical students, approximately two hours per week.
    b. Graduate Medical Courses

        i. 1986 -      Course developer and instructor, "Psychodynamic Formulation," an advanced course included in the required core curriculum for PGY-III psychiatric residents at the Massachusetts General Hospital, Boston, Massachusetts. This course typically involves 12 –16 residents, and lasts usually 11 –14 weeks, for one hour per week. It typically requires approximately one hour of preparation for each hour of teaching.
        ii. 1981 - 1986      Course developer and instructor, "Introduction to Psychodynamic Formulation," included in the required core curriculum for first-year residents in psychiatry at the Massachusetts General Hospital, Boston, Massachusetts. This Course was the predecessor of

5

Curriculum Vitae, Christopher David Gordon, page 6

the course above, and was more limited in scope, lasting approximately six weeks, with the same amount of preparation.

iii. 1980 - 1987      Course developer and instructor, "Introduction to Short-term Therapy and Crisis Intervention," a yearlong course for first-year residents in the Acute Psychiatry Service, Massachusetts General Hospital, Boston, Massachusetts. This course overall involved 12 residents, in four rotations, each of which lasted three months. Teaching involved approximately one hour per week, with one hour of preparation for each hour of teaching.

iv. 1982 - 1984      Course Developer and Instructor, "Psychotherapy of Eating Disorders," a yearlong course for clinicians in the Eating Disorders Unit of the Massachusetts General Hospital. Participants included 25 Residents, post-doctoral candidates in Psychology and independent clinicians of the Eating Disorders Unit. Teaching was one hour per week, with one hour of preparation for each lecture.

c. Invited Presentations

i. 2003      Presenter, Massachusetts General Hospital Psychotherapy Supervisor's Conference: "Psychodynamic Formulation."

ii. 2002      Presenter, Massachusetts General Hospital Psychotherapy Supervisor's Conference: "Psychodynamic Formulation."

iii. 2002      Lecturer, Framingham Police Department, "Suicide Prevention" and "First Responder Training."

iv. 2001      Lecturer, Massachusetts State Police Tactical Unit: "Crisis Intervention for Police Officers."

v. 1996      Lecturer, Grand Rounds, Westborough State Hospital, "Clinical Negotiation."

vi. 1995      Guest Presenter, Department of Mental Health Conference on Psychiatric Rehabilitation, "Clinical Negotiation and Psychopharmacology."

vii. 1991      Grand Rounds Presentation, Norwood Hospital, "Family dynamics in Anorexia Nervosa."

viii. 1990      Grand Rounds, Massachusetts General Hospital Department of Psychiatry, "Contract-Based Family Therapy with Hospitalized Adolescents."

ix. 1988      Consulting Lecturer, Pembroke Hospital. Topic: "Recovery in Anorexia Nervosa."

x. 1987      Consulting Lecturer, Pembroke Hospital. Topic: "Psychotherapy of Anorexia Nervosa."

xi. 1987      Grand rounds Presentation, Mt. Auburn Hospital. Topic: Strategic and Paradoxical Strategies in Psychotherapy."

xii. 1985      Visiting Lecturer, University of Massachusetts, Department of Psychiatry, Worcester, MA. Grand Rounds. Topic: "Non-dynamic Strategies in Psychotherapeutic Change."

Curriculum Vitae, Christopher David Gordon, page 7

    xiii.  1984      Visiting Consultant, Tufts University Counseling Center, Medford, Massachussets.

    xiv.  1982      Lecturer, with Eugene Beresin, MD, Grand Rounds, Department of Psychiatry, Massachusetts General Hospital. Topic: "Hidden Conceptual Models in the Inpatient Management of the Borderline Patient."

    xv.  1984      Visiting Consultant, Mt. Auburn Hospital Psychiatric Inpatient Service, Cambridge, MA.

    xvi.  1977      Lecturer, with Edward Messner, MD, Psychiatric Grand Rounds, Massachusetts General Hospital. Topic: "Contract and Alliance in Supervision."

    xvii.  1980 - 1987      Case conference discussant on the inpatient services of the Massachusetts General Hospital and Erich Lindemann Mental Health Center, approximately four conferences per year.

  d.  Continuing education courses

    i.  2004, 2005      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course on Psychosomatic Medicine, topic "Personality-disordered and difficult patients."

    ii.  1985 – present      Annual speaker at Harvard Medical School and Massachusetts General Hospital Department of Psychiatry Review Course. Topic:" Guidelines for Time-Limited Interviewing."

    iii.  1994      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course on Emergency Psychiatry, "Clinical Negotiations in the Emergency Room Setting."

    iv.  1993      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course in Personality Disorder, "The History of the Diagnosis of Personality Disorder."

    iv.  1992      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course on Forensic Psychiatry, topic "Personality Disorders."

    v.  1991      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course on Borderline and Narcissistic Disorders: "Short-term Inpatient Treatment of Borderline Personality Disorder."

    vi.  1991      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course on Eating Disorders: "Psychodynamics of Anorexia Nervosa."

    vii.  1991      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course on Treatment of Severely Disturbed Adolescents: "Brief Inpatient Treatment of Adolescents."

    viii.  1990      Lecturer, Harvard Medical School and Massachusetts General Hospital Postgraduate Course on Emergency Psychiatry:

Curriculum Vitae, Christopher David Gordon, page 8

       "Negotiation and Formulation in Crisis Intervention."

ix. 1990       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Treatment of the Severely
Disturbed Adolescent, "Brief Hospitalization of Adolescents."

x. 1989       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Adolescence: "Brief
Hospitalization of Adolescents and Young Adults."

xi. 1986       Lecturer, Harvard Medical School and Massachusetts
General hospital Postgraduate Course on Anorexia and Bulimia.
Topics: "Psychotherapeutic Strategies in Anorexia Nervosa" and
"Impasses in Therapy for Anorexia Nervosa."

xii. 1985       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Office Practice, "Brief
Psychotherapy."

xiii. 1984       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Psychiatric Office Practice.
Topic:    "Strategic and Paradoxical Interventions in Psychotherapy."

xiv. 1984       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Anorexia and Bulimia.
Topics:    "Environmental Failure and Intrapsychic Conflict in
Anorexia Nervosa" and "Psychotherapeutic Strategies in Anorexia
Nervosa."

xv. 1983       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Eating Disorders.
Topic:    "Psychodynamic Aspects of Anorexia Nervosa."

xvi. 1980 - 1983       Lecturer, Harvard Medical School and
Massachusetts General Hospital Postgraduate Course on Current
Psychiatric Practice.
Topic:    "Inpatient Management of the Borderline Patient."

xvii. 1980       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Psychopharmacology.
Topic: "Anxiety Disorders.

xviii. 1979 - 1981       Lecturer, Harvard Medical School and
Massachusetts General Hospital Postgraduate Course on Differential
Diagnosis in Psychiatry.
Topic: "Cerebrovascular Disease."

xix. 1978       Lecturer, Harvard Medical School and Massachusetts
General Hospital Postgraduate Course on Medical Psychiatry.
Topic:    "Psychiatric Manifestations of Collagen Vascular Disease."

e.  **Advisory and supervisory responsibilities**

    i. 1980 - 1998       Supervisor of psychotherapy, Massachusetts General
Hospital, Boston, MA, supervising 2-3 PGY-II, III or IV residents/year,
150 hours/year

Curriculum Vitae, Christopher David Gordon, page 9

       ii.   1982 - 1987      Supervising Psychiatrist, Eating Disorders Unit, Massachusetts General Hospital, Boston, MA, 50 hours/year.

      iii.   1981- 1992,      Supervisor, Inpatient Psychiatric Service, Massachusetts General, 50 hours/year

      iv.   1980 - 1983      Senior Supervisor, Acute Psychiatry Service, Massachusetts General Hospital, Boston, MA., 50 hours/year.

Curriculum Vitae, Christopher David Gordon, page 10

   f.  **Teaching leadership roles**
       i.  1985 -1987        Director, Acute Psychiatric Service, Massachusetts
           General Hospital, Boston, Massachusetts.
       ii.  1983 - 1985       Co-Director, Acute Psychiatry Service,
           Massachusetts General Hospital, Boston, Massachusetts
       iii. Former supervisees include:
           1. Eugene Beresin, MD, 1979, one year; currently Director of
              Child Training, Massachusetts General and McLean Hospitals
           2. David Herzog, MD, 1979, one year; currently Director of the
              Eating Disorders Unit, Massachusetts General Hospital
           3. Gary Sachs, MD, 1984, one year; currently Director, Bipolar
              Research Unit, Massachusetts General Hospital
           4. Laura Scheingold, MD, 1997, two years; currently Staff
              Psychiatrist, San Francisco General Hospital
           5. Paul Summergrad, MD, 1985, one year; currently, Psychiatrist-
              in-Chief, New England Medical Center
   g.  **Description of Major Curriculum Offerings**
       As described above, my principal areas of focus and teaching have been in the
       arenas of psychodynamic formulation, offering a course in the Psychiatry
       Department Core Curriculum at Massachusetts General Hospital for over 20
       years; emergency psychiatry and short-term therapy; and clinical interviewing.
       I have also been a supervisor of psychotherapy, and a discussant at numerous
       case conferences.
   h.  **Report of Clinical Activities**
       i.  I have practiced in a variety of settings, including outpatient office
           practice (with an active private practice of general psychiatry for adults
           and adolescents for the past 25 years); been a Medical Director of
           psychiatric hospitals, both primarily psychiatric and as part of a general
           medical center; and have been a clinical leader and care provider in an
           inner city, full service mental health center, offering crisis and
           emergency as well as outpatient and residential services.  I am
           comfortable treating, and have treated, many people with virtually all
           psychiatric conditions, from the full spectrum of economic and cultural
           backgrounds.
       ii.  I have endeavored to practice, in all settings, the humanitarian and
           physicianly qualities which I learned from my two great teachers, Aaron
           Lazare, and Thomas Hackett.

**III. Bibliography**

**Original articles**

Curriculum Vitae, Christopher David Gordon, page 11

1. Gordon CD. Differential diagnosis of cimetidine-induced delirium: a case report. Psychosomatics 1981;22(31):251-252.

2. Beresin EV and Gordon CD. Emergency ward management of the borderline patient. Journal of General Hospital Psychiatry 1981;3:237-244.

3. Gordon CD and Beresin EV. Conflicting treatment models for the inpatient management of borderline patients. American Journal of Psychiatry 1982.140(81):979-983.

4. Herzog DB, Norman DK, Gordon CD and Pepos M. Anorexia nervosa and bulimia in males. American Journal of Psychiatry. 1984.141(81):989-990.

5. Hoge SK, Sachs G., Applebaum PS, Greer A, and Gordon CD. Limitations on Psychiatrists' Discretionary Civil Commitment Authority by the Stone and Dangerousness Criteria. Archives of General Psychiatry 1988.Vol.45: 764-769.

6. Gordon CD, Herzog DH, and Beresin EV. The child's illness and the parents' relationship in anorexia nervosa. Journal of the American Academy of Psychoanalysis 1989. 17(11): 29-42.

7. Beresin EV, Gordon CG, and Herzog DH. The process of recovery in anorexia nervosa. Journal of the American Academy of Psychoanalysis 1989. 17(11): 103-130.

8. Gordon CD and Riess H. Formulation as a Collaborative Conversation. Harvard Review of Psychiatry, 2005; 13:112-123.

Book Chapters:

1. Beresin, EV, Falk, WE and Gordon, CD, Borderline and other personality disorders. In Hyman SE, Tesar, GE, editors. Manual of Psychiatric Emergencies. (3rd ed.). Boston: Little, Brown; 1994. p.178-197.

2. Fishel, A and Gordon, CD. Treating the family in the emergency department. In Hyman SE, Tesar, GE, editors. Manual of Psychiatric Emergencies. (3rd ed.) Boston: Little, Brown; 1994. p.45-53.

3. Gordon, CD. Crisis intervention: a general approach. In Hyman SE, Tesar, GE, editors. Manual of Psychiatric Emergencies. (3rd ed.) Boston: Little, Brown;1994. p.12-19

4. Gordon CD and Gorral A, Time Effective Interviewing in Primary Care, in Massachusetts General Hospital Handbook of Psychiatry in Primary Care, McGraw-Hill, 1998

11

Curriculum Vitae, Christopher David Gordon, page 12

5.  Gordon, CD, Evaluation of psychiatric patients in the emergency department. In Jenkins, JL and Braen, GR, editors. Manual of Emergency Medicine. Boston: Little Brown; 2000. p. 587-597.

6.  Gordon, CD, Managing agitation and aggression in the emergency department. In Jenkins, JL and Braen, GR, editors. Manual of Emergency Medicine. Boston: Little Brown; 2000. p. 597-599.

7.  Gordon, CD, Evaluating the suicidal patient in the emergency department. In Jenkins, JL and Braen, GR, editors. Manual of Emergency Medicine. Boston: Little Brown, 2000. p. 599-605.

8.  Gordon, CD, Evaluation and management of drug and alcohol problems in the emergency department. In Jenkins, JL and Braen, GR, editors. Manual of Emergency Medicine. Boston: Little Brown, 2000. p. 606-617.

9.  Gordon CD and Gorral A, Effective Interviewing in Primary Care Medicine, in Massachusetts General Hospital Handbook of Psychiatry in Primary Care, Second Edition, McGraw-Hill, 2004

10. Gordon CD and Riess, H, The Psychodynamic Formulation as a Collaborative Conversation. Harvard Review of Psychiatry, in press.

Letters:

1.  Gordon CD and Beresin EV (letter). Treatment modes need not conflict, reply. American Journal of Psychiatry 1984. 141(91):1133-1134.

Book Review:

1.  Gordon CD. Getting down to where it hurts: emotional expression in psychotherapy. Journal of Contemporary Psychiatry 1984. 3131:188-190.

Continuing Education Material:

1.  Gordon CD. Selecting a residency. The New Physician 1978. 27(81):28-30.

2.  Gordon CD. The art of therapeutic surrender. The New Physician 1979. 28(21):45-46.

3.  Gordon CD.   Treating depression in the general' hospital. The New Physician 1979. 28(151):33-34.

4.  Gordon CD. Critical negotiations: patients who refuse treatment for life threatening conditions. The New Physician 1979. 28(171):31-32.

# *Commonwealth of Massachusetts*



## OFFICE OF THE SHERIFF
### COUNTY OF WORCESTER
### JAIL AND HOUSE OF CORRECTION
### 5 PAUL X. TIVNAN DRIVE
### WEST BOYLSTON, MASSACHUSETTS 01583
### TELEPHONE (508) 854-1800
### Fax (508) 856-0465
### TTY (508) 854-1888

GUY W. GLODIS
*SHERIFF AND SUPERINTENDENT*

JEFFREY R. TURCO, ESQ.
*SPECIAL SHERIFF*
*DEPUTY SUPERINTENDENT*

## SENDING s. 18a EVALUATION AND REFERRAL FORM

**NOTE TO COURT:** Please send a copy of this Evaluation to the Receiving Facility

**Date:** 6/6/05                    **Court:** Clinton District Court
**Name:** Todd Williams            **Date of Birth:** 11/10/77
**Facility Making a Request for Transfer to a Psychiatric Facility:** Worcester County Jail & House of Correction (WCJHoC)

**Legal Status:** Sentenced
**Charges:**

**Reason for Referral:.** Mr. Williams made a noose with his blanket and attempted to hang himself on 6/4/05. He was on a suicide watch at the time. He continues to state that he wants to die. He has a history of treatment for depression.

**Sources of Information:**
    1.)    Consultation with Mental Health Staff at Worcester County Jail & House of Correction ;
    2.)    Review of portions of Mr. William's Worcester County Jail & House of Correction Medical Record and Placement on Suicide Watch Forms;
    3.)    Interview with Todd Williams on June 6, 2005 for a total of approximately 30 minutes.

**Non-Confidentiality Warning:** I informed Mr. Williams that I am a psychologist and that I would be examining him for transfer to a psychiatric facility. I informed him that the content of our discussion would not be confidential because I would report my observations to the Court, and I might be asked to testify about the content of our discussions. He was also informed that he could decline to participate in any and all of the evaluation but that I would be writing a report nonetheless. Mr. Williams appeared to understand the nature of this warning as evidenced by his ability to paraphrase it in his own words. Specifically, he stated "we are meeting because I'm on a Suicide Watch...because I tried to kill myself." When asked if the interview would be confidential,

he responded, "no" because my report would go to "the Court." Mr. Williams ultimately agreed to answer my questions and the evaluation proceeded.

**Brief History:** Mr. Williams has provided different versions of his history. He has, however, consistently described his upbringing as abusive. He reports he grew up in foster and group homes. He has at least one sibling and remains in contact with his mother. He has some college education at Clark University and Northeastern but it is not clear if he completed college. He reports he has worked in the Nursing field. He stated he was working as a Nurse Manager at Mass General Hospital and as a clerk "part-time at Stop and Shop" prior to his incarceration. He was reportedly living in his own home in the Boston area. According to records, he was experiencing problems with his husband and they were in the process of divorcing.

Mr. Williams has a significant family history of substance abuse and suicide. He reports both of his parents abused drugs and alcohol. He has a maternal aunt who died by suicide in 2000. He denied having problems with drugs or alcohol. "I saw what it did to my parents." During previous evaluations, however, he has acknowledged heavy alcohol use since the age of 16. Mr. Williams reported he is treated for depression by his Primary Care Doctor, Dr. Petrow. According to Mr. Williams Dr. Petrow has treated him with Celexa for the past 18 months. Mr. Williams has a history of psychiatric hospitalization at approximately age 12 (at Providence Hospital). He denies any adult hospitalizations. He denies a history of head injury or serious medical problems.

**Current Mental Functioning:** Mr. Williams presented in his boxers and shackles. He stated he was stiff from being in 4-point restraints. Mr. Williams' mood was depressed. His affect, or the observable expression of mood, was somewhat restricted. He stated his sleep was impaired and reported nightmares. "I got robbed at gunpoint a few times when I was working for Store 24. In my dreams I keep winding up dead." Mr. Williams reported hearing voices for the past month. "They're deep. They tell me to die...to hurt myself." He also stated he "sees shadows." Mr. Williams did not express any paranoid or delusional thinking. He indicated he continues to want to die. "The bible says when you die God takes away your suffering." His insight into his problems was limited. His judgement, as evidenced by his recent hanging attempt, was impaired.

**Adjustment to the Jail Setting:** Mr. Williams was admitted to Worcester County Jail & House of Correction in January 2005. He was housed in the protective custody unit (K-block) without incident until May 24, 2005. He was followed by mental health staff and treated with Celexa and Remeron. On 5/24/05, he was placed on Suicide Watch because "he was crying after getting a D-Board." On 5/27/05, he was observed rolling up a sheet. He reportedly stated "he was going to hang it up if he stays down the J-building." On June 4, 2005, officers cut him down after he fashioned a noose out of his blanket while on suicide watch.

**Suicide/Homicide Risk Assessment:** Mr. Williams has a history of frequent placement on Suicide Watch during his prior incarceration in 2000. He also submits multiple requests for medical treatment for various medical complaints. He has a family history of suicide. He has been treated for depression. He attempted to hang himself on 6/4/05. He continues to state that he wants to die. These factors suggest that he is at increased risk for imminent and longterm suicide.

Mr. Williams has a history of making bomb threats and reportedly impersonated a police officer when calling his probation officer. When he was evaluated by mental health staff on 5/24/05, he reported thoughts of wanting to harm correctional officers and acknowledged having a specific undisclosed plan.

**Interventions Attempted:**  Mr. Gonzales has been followed by mental health staff since his admission to Worcester County Jail & House of Correction. He has been prescribed Celexa and Remeron (i.e., anti-depressant medications) and Risperdal (i.e., an anti-psychotic medication). He has been closely monitored on Suicide Watch in the Maximum Security Unit.

**Conclusions Concerning the Current Need for Psychiatric Hospitalization by Reason of Mental Illness:** It is my clinical opinion that Mr. Williams is presenting with significant symptoms of a mental illness. They include depressed mood, restricted affect, impaired sleep, command auditory hallucinations, suicidal thoughts and impaired insight and judgement. Mr. Williams appears highly motivated to avoid disciplinary action at WCJHOC and has repeatedly threatened to hang himself. He has demonstrated that he is willing to up the ante with his behavior if necessary resulting in a potentially lethal behavior. Whereas malingering can not be ruled out at this time, Mr. Williams has reported that his symptoms are worsening and he is now experiencing command auditory hallucinations. I am therefore recommending that he be considered for transfer to the strict security of Bridgewater State Hospital at this time.

**Recommended Facility:** Mr. Williams has a significant history of anti-social behavior. He has acknowledged having a plan to harm correctional officers at Worcester County Jail & House of Correction. I am therefore recommending that he be considered for transfer to the strict security of Bridgewater State Hospital.

**Specific Issues that might be addressed during Evaluation at Facility:**  We would appreciate any recommendations regarding management of Mr. Williams's behavior should he return to this correctional setting.

**Respectfully Submitted:**

Hanya H. Bluestone, Ph.D., D.F.P.
Licensed Psychologist
Designated Forensic Psychologist



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Bridgewater State Hospital*
*20 Administration Road*
*Bridgewater, Massachusetts 02324*
*www.mass.gov/doc*

**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Edward A. Flynn**
*Secretary*

**Kathleen M. Dennehy**
*Commissioner*

**James R. Bender**
*Deputy Commissioner*

**Kenneth W. Nelson**
*Superintendent*

July 1, 2005

John M. Flynn, Sheriff
Worcester County House of Correction
5 Paul X. Tivnan Drive
West Boylston, MA 01583

**Re: Todd Williams, BSH #M90612**

Dear Sir:

The above-named patient was admitted to Bridgewater State Hospital on June 6, 2005 under the provisions of Chapter 123, §18(a), ordered here by the District Court of Clinton from the Worcester County House of Correction where he is currently serving a sentence.

We have completed our observation and evaluation and have concluded that the above-named patient does not meet the clinical and legal criteria for commitment under §18 at this time.

The reader is respectfully referred to the enclosed §18(a) Evaluation. Should your facility require a copy of the patient's Bridgewater State Hospital record in its entirety, please have your Hospital Records Office contact our Record Manager. The written request must be accompanied by the enclosed releases of confidential information signed by the inmate and witness. These records are confidential and if obtained shall not be released to any third party.

Sincerely,

Gregg A. Belle, Ph.D.
Designated Forensic Psychologist

GAB/ls
Enc.
cc: District Court of Clinton

Printed on Recycled Paper

# BRIDGEWATER STATE HOSPITAL                                    1

**WILLIAMS, Todd**

**BSH #M90612**

### 18(a) EVALUATION

**July 1, 2005**

Gregg A. Belle, Ph.D.

**IDENTIFYING INFORMATION:** This is the first Bridgewater State Hospital (BSH) admission for Mr. Todd Williams, a 27-year-old (DOB: November 10, 1977), single male. He was admitted on June 6, 2005, from Worcester County Jail & House of Correction (Worcester) for a mental health evaluation pursuant to M.G.L., Chapter 123, § 18(a). Mr. Williams is serving a one-year sentence for Violation of Probation from a 2001 conviction on the charge of Police Officer, Impersonate. He has a good conduct date of January 29, 2006. Mr. Williams also has an outstanding warrant on the charge of Medicine, Practice Under False Name.

**WARNING ON THE LIMITS OF CONFIDENTIALITY:** At the beginning of each interview, I informed Mr. Williams that I am a forensic psychologist and that I wanted to examine him per order of the Court to gather information that the Court could use in determining his need for further care and treatment. I explained that my observations of him and the information he provided would not be held confidential, but could be included in a written report that I would submit to the Court and/or in oral testimony. I informed Mr. Williams that he did not have to participate in the evaluation at all, that he could answer questions selectively, and that he could stop the interview at any time. I explained that I would submit a report to the Court whether or not he chose to speak with me.

When asked to repeat the substance of the aforementioned warning, Mr. Williams replied, "Nothing is confidential. This goes back to the court. I don't have to talk." In my clinical opinion, Mr. Williams understood the so-called "Lamb warning" and was able to retain this information in the subsequent interviews.

**SOURCES OF INFORMATION:** In preparing this evaluation, I have relied upon data gathered from the following:

1.  Interviews with Mr. Williams on June 30 and July 1 2005, for a total of approximately 45 minutes. Mr. Williams abruptly terminated the second interview after 15 minutes.
2.  Consultation with Mr. Williams' clinical treatment teams at Bridgewater State Hospital.
3.  Review of Mr. Williams' Bridgewater State Hospital medical and administrative records.
4.  Review of Order of Commitment of a Prisoner for Observation pursuant to G.L. c. 123, § 18(a) dated June 6, 2005, issued by the Clinton District Court.
5.  Review of Request for Commitment for Observation pursuant to G.L. c. 123, § 18(a) completed by Hanya Bluestone, Ph.D., dated June 6, 2005.
6.  Review of 18(a) Referral Form by Dr. Bluestone dated June 6, 2005.

**BRIDGEWATER STATE HOSPITAL**                              2

**WILLIAMS, Todd**
                                                    **BSH #M90612**

18(a) EVALUATION

**July 1, 2005**                                    Gregg A. Belle, Ph.D.


**CIRCUMSTANCES OF ADMISSION:** The request for commitment completed by Hanya Bluestone, M.D. on June 6, 2005 stated:

> "Mr. Williams is presenting with significant symptoms of a mental illness. They include depressed mood, restricted affect, impaired sleep, command hallucinations, and suicidal thoughts.

> Mr. Williams made a noose with a blanket and attempted to hang himself on 6/4/05. He was on a suicide watch at the time. He continues to state that he wants to die. He has a history of treatment for depression...He has a significant history of antisocial behavior."

Dr. Bluestone described his adjustment to the jail setting as such:

> "Mr. Williams was admitted to Worcester in January 2005. He was housed in the protective custody unit (K-block) without incident until May 24, 2005. He was followed by mental health staff and treated with Celexa and Remeron. On May 24, 2005, he was placed on Suicide Watch because 'he was crying after getting a D-Board.' On May 27, 2005, he was observed rolling up a sheet. He reportedly stated 'he was going to hang it up if he stays in the J-building.' On June 4, 2005, officers cut him down after he fashioned a noose out of his blanket while on suicide watch."

Dr. Blusetone described his suicide/homicide risk assessment as:

> "Mr. Williams has a history of frequent placement on Suicide Watch during his prior incarceration in 2000. He also submits multiple requests for various medical complaints. He has a family history of suicide. He has been treated for depression...He continues to state that he wants to die. These factors suggest that he is at increased risk for imminent and longterm suicide.

> Mr. Williams has a history of making bomb threats and reportedly impersonated a police officer when calling his probation officer. When he was evaluation by mental health staff on 5/24/05, he reported thoughts of wanting to harm correctional officers and acknowledged having a specific undisclosed plan."

**BRIDGEWATER STATE HOSPITAL**                                    3

**WILLIAMS, Todd**

                                                                **BSH #M90612**

_____

                          18(a) EVALUATION
**July 1, 2005**
                                                        **Gregg A. Belle, Ph.D.**

Dr. Bluestone further noted,

> "Mr. Williams appears highly motivated to avoid disciplinary action at
> (Worcester), and has repeatedly threatened to hang himself. He has demonstrated
> that he is willing to up the ante with his behavior if necessary resulting in a
> potentially lethal behavior. Whereas malingering can not be ruled out at this time,
> Mr. Williams has reported that his symptoms are worsening and he is now
> experiencing command auditory hallucinations…"

**PATIENT'S VERSION OF THE CIRCUMSTANCES SURROUNDING TRANSFER:** Mr.
Williams reported that he had three suicide attempts over a three-week period before his BSH
transfer (although only one noted in Worcester referral information). Mr. Williams added, "I
didn't want to live. I feel hopeless, my life is bleak." Mr. Williams is adamant that he needs
further psychiatric care at a DMH facility or Shattuck Hospital. He stated, "I don't believe I need
inmate level of care at BSH. If I go back to Worcester, I don't know. I'm going to become more
dysfunctional." Mr. Williams wrote in a letter to his case administrator,

> "…Mr. Williams is not severely mentally ill therefore civil commitment and/or
> continued confinement at Bridgewater State Hospital is unnecessary. His
> discharge will not create a likelihood of serious harm by reason of mental illness,
> nor does he require the strict security of Bridgewater State Hospital. Because Mr.
> Williams does have a mental condition, further psychiatric care is necessary. Mr.
> Williams will not receive adequate psychiatric care at the Worcester House of
> Correction because of the low doctor/inmate ratio, understaffing of non-medical
> personnel make effective personal and group counseling impossible…Mr.
> Williams has a constitutional right to adequate psychiatric care for his mental
> condition. To receive adequate psychiatric care Mr. Williams should be
> transferred to the Shattuck Hospital Correctional Unit in Jamaica Plain…"

Mr. Williams reported that he suffers from "Bipolar Disorder, Paranoid Personality Disorder, and
Gender Identity Disorder." Nonetheless, he could not accurately describe many symptoms
generally associated with the disorders he mentioned. Upon Mr. Williams learning that he would
not be transferred to Shattuck, nor remain at BSH, he stated, "I don't feel safe going back to
Worcester…I'm not mentioning any names, but something happened to me there which is why I
don't want to go back." Mr. Williams alleged that the incident occurred in February and has been
ongoing." He would not elaborate. Mr. Williams then terminated the second interview stating,
"If you're sending me back there's no sense talking to you anymore."

Of note, following the conclusion of my second interview, Mr. Williams informed his case
administrator that he was allegedly raped by a correctional officer at Worcester and is

BRIDGEWATER STATE HOSPITAL                    4

**WILLIAMS, Todd**

BSH #M90612

---

18(a) EVALUATION

**July 1, 2005**

Gregg A. Belle, Ph.D.

experiencing an increase in auditory hallucinations.  His case administrator informed relevant
BSH staff of this allegation and I informed Sandy Fallon, LICSW, Mental Health Director at
Worcester.

**RELEVANT HISTORY:** According to information contained in his BSH records and Dr.
Bluestone referral report, Mr. Williams has been continually described by various mental health
clinicians as providing different versions of his history.  I also found Mr. Williams to be an
unreliable historian; therefore, the following history comes from a letter written by Mr.
Williams on June 27, 2005 to his case administrator.

> "I am very charismatic, interesting and uplifting to be with.  That is the image I
> portray to other people.  The reality is that my life is much more complex and
> challenging.  The inner me is a nightmare – I am a miserably unhappy man.  Too
> often we think we know who we are, when all we're doing is defining ourselves
> by a list of outer qualities.
>
> In order to know my true self I must go back and look at how I became the
> person I am today.  For me it's hard and painful to look back at my childhood.
> My parents got divorced when I was young.  Both of my parents were drunks
> and addicted to drugs.  As a child I was never shown any affection.  There was
> never any hugs or kisses.  In my mother's eyes I could never do anything right.
> As a child I felt there wasn't much hope at a happy life.  I was subjected to hell
> on a daily basis.  My mother had many boyfriends, and they were more
> important to her than my brother or I.  One of my mother's boyfriends was very
> abusive, he beat me all the time and my mother never did anything about it.  One
> of her other boyfriends sexually abused me.
>
> By the time the Department of Social Services took my brother and I, I just felt
> like life was over – I wanted to die.  While in the custody of DSS I lived with my
> Grandparents, foster, homes, group homes and a hospital.  My behavior became
> very aggressive and at times dangerous to self and others.  I was aggressive
> toward everyone, cursed and destroyed things.  I was disruptive and out of
> control, and every day I went into a rage.  As a child I had feelings of emptiness,
> intense anger and difficulty in controlling that anger.
>
> Looking back at my childhood is so painful because I didn't have a childhood.  I
> was robbed of my childhood, abused and neglected.  I felt like I was one big
> mistake, like I was no good and never would be.

**BRIDGEWATER STATE HOSPITAL**                              5

WILLIAMS, Todd                                              BSH #M90612

18(a) EVALUATION

July 1, 2005                                    Gregg A. Belle, Ph.D.

When as a child our basic needs for reliable love, comforting, and safety are not met, it brings about a state of chronic anxiety, fear, shame, anger and emotional isolation. When as a child you cannot count on the adults in your life for love and respect, you grow physically but a part of your emotional growth and development gets slowed down or held back. Our willingness to trust people, or to be open and spontaneous goes underground. We build a wall around us to make sure we don't get hurt again. A wall of toughness, wall of deadness, a wall of anger and defiance all because we are hurting, scared and angry.

As a teenager I hated who and what I was so I lived on the edge. I was hurting, hurting and hurting. I felt helpless and hopeless but very hypersexual. I was gay, extremely sexually active and with multiple partners. I didn't like the fact that I was a young man. I wanted to be a young lady, and I felt helpless that I could not change the fact that I was a young man. The things I didn't get as a child I wanted even more as a teenager. I craved love, craved to be held and craved to be special. I wanted to be accepted, valued, and appreciated. I wanted to be the best that I could be but because of the hurt, I felt like I wasn't god enough. My family was always so very critical of me. Stressing my shortfalls, and telling me that I was going to be a failure. I felt like I could never be good enough. I got angry because I was hurt and couldn't get my needs met. My anger was destructive and painful.

As an adult my life has been a mess. I did 2 ½ years for making a false report of a bomb – 16 counts, and now a year for impersonating a police officer. I feel like in life I have been pushed down and denied. I still hate that I am a man, I want so much to be a woman. I have a lot of, of anger and, and depression hurting me. I go into these out-of-control rages hurting myself, others that I care about and people I don't even know. In my relationship with William I have a lot of anger in me. I expressed that anger in unhealthy ways. My anger became very dangerous and hurtful, sometimes physically, but more so emotionally. Sarcastic comments and terrible fights. After each fight I felt sorry and sad, and cried. In my life there's been a lot of negative, hurtful and insensitive behavior. I've put up with abuse, violence, betrayal, and dishonesty. This has made me feel not wanted, helpless and hopeless. My life is painful and a constant struggle. I've attempted suicide several times. I've had suicidal flashes, and I've pictured myself dead. I sometimes think that people are talking about me, pointing at me or/and out to get me – hurt me. I think that sometime my family would be better off with me gone. For a long time I've known that there is something wrong with me, however I have a wall built up around me, and I'm afraid to let people in. I know what I have done wrong in life. I can see all the pain I've caused my

**BRIDGEWATER STATE HOSPITAL**                6

**WILLIAMS, Todd**                                                **BSH #M90612**

18(a) EVALUATION
<u>July 1, 2005</u>                                              Gregg A. Belle, Ph.D.

own family, people I love and people I don't even know.  Of my guilt I am not ashamed, but of ignorance I am mortified.

I am here at Bridgewater because I tried to commit suicide, and I did that because I was reading Rev. 21:4, God takes our pain and fears, sorrow and tears away when we die.  At the time I was struggling with my feelings of self-worth.

I felt like I had not right to live, I was a nothing.  Now I realize that suicide would have been a coward's way out of having to deal with feelings. Bridgewater has been a starting point for rebuilding me.  I am manic-depressive, and bipolar, and I've got a gender Identity Disorder, and Adjustment Disorder. Bridgewater is for me the end and the beginning.  I've learned to separate different aspects of my life and deal with individually.  There is a bigger plan, and my life fits into it.  The doctor here seems to think that I have an adjustment disorder, and other than that he thinks I am normal.  I think that what he means, is that I have a mental illness, but I am not severely mentally ill, as to where I should not need to be committed.  I have four months remaining in a one year sentence, I need to work on myself, and I am asking you to help me go to a place where I can do that."

Of note, Mr. Williams' mother informed his case administrator that her son only has a sixth grade education despite informing BSH staff that he has a nursing degree.  She reported that her son has a "temper," especially under the influence of alcohol and can become violent.

**COURSE OF HOSPITALIZATION:** Mr. Williams was admitted to this facility on the evening of June 6, 2005 and housed on the Intensive Treatment Unit (ITU) per hospital protocol.  Upon admission, Mr. Williams denied experiencing any auditory hallucinations and contracted for safety.  The next day, he was transferred to the more restrictive admissions/observation unit (B-1).  His case administrator described Mr. Williams as

"Many of Mr. Williams' responses were inconsistent with referral information (regarding past suicidal ideation, attempts, substance abuse history).  Mr. Williams reported that his recent suicide attempt was 'very out of character,' and that he no longer has any of those thoughts…Mr. Williams presentation appeared superficial.  Responses were glib, shallow affect.  He reported his mood was 'great' and denied suicidal ideation, neurovegetative symptoms of depression.  Thoughts were organized, logical, relevant.  Mr. Williams' presentation appears odd given his recent suicide attempt and reported depression…"

**BRIDGEWATER STATE HOSPITAL**                                          7

**WILLIAMS, Todd**                                                 **BSH #M90612**

---

18(a) EVALUATION
**July 1, 2005**                                              **Gregg A. Belle, Ph.D.**

---

On June 8, Mr. Williams' treating psychiatrist reported, "Although he does not have clear symptoms of major depression, will continue antidepressant given suicide attempt." On June 8, Mr. Williams informed his case administrator that he did not wish to be committed to BSH because he was concerned about missing his opportunity for parole if committed.

On June 9, Mr. Williams denied any suicidal ideation or feeling depressing, describing his mood as "great." On June 13, Mr. Williams was transferred to less restrictive admissions/observation unit (B-2). One June 15, his treating psychiatrist reported, "Feels well, not depressed, no suicidal thoughts. Can't account for prior suicide attempt except to say he had 'idle thoughts.' Cheerful, smiling, superficial, no signs of depression, engages easily...patient does not want to continue Prozac." Later that day, he informed his case administrator that he "felt great" about being taken off his psychiatric medication and wanted to return to jail as soon as possible. He was described as "Appears to be in no acute distress and has consistently denied feeling depressed or wanting to hurt himself..." On June 23, his treating psychiatrist resumed his order of Remeron (antidepressant) since he came from jail on that medication. His treating psychiatrist added, "Resume order though I've told him I don't think it will make much difference.

Throughout his course of hospitalization, Mr. Williams has not engaged in any assaultive or self-injurious behaviors. In addition, he continually denied any suicidal ideation, homicidal ideation, intent, or plan.

**CURRENT PSYCHIATRIC MEDICATIONS:**
Remeron (antidepressant) 30 mg at night.

This medication was resumed on June 23.

**CURRENT MENTAL FUNCTIONING:** Mr. Williams is an African American male of small stature. For each interview, his hygiene and grooming were adequate. Initially Mr. Williams was pleasant and cooperative during both interviews; however, upon learning that I did not believe he suffered from a mental illness and would be returning to Worcester, he became adversarial and abruptly terminated the second interview after 15 minutes. Notwithstanding, Mr. Williams maintained good eye contact with me and displayed normal movements and mannerisms. His speech was of normal volume, rate, and tone. For each interview, Mr. Williams was able to establish sufficient rapport for purposes of the current evaluation.

Mr. Williams reported that he is not presently suicidal but "I do have flashes, thoughts, and dreams of dying. I don't believe I need inmate level of care at BSH." Mr. Williams reported that he suffered from "Bipolar Disorder, Paranoid Personality Disorder, and Gender Identity Disorder." Nonetheless, he could not accurately describe many symptoms generally associated

## BRIDGEWATER STATE HOSPITAL                                8

**WILLIAMS, Todd**                                                    **BSH #M90612**

### 18(a) EVALUATION
**July 1, 2005**                                          Gregg A. Belle, Ph.D.

with the disorders he mentioned. Mr. Williams did not present as depressed or despondent; however, he reported poor appetite and sleeping only a few hours a night. Mr. Williams added, "It seems like no one cares about me. I'm looking to get help and no one is helping me." Although Mr. Williams reported that he has "rapid mood swings," he did not present as hypomanic. Mr. Williams adamantly denied having any suicidal ideation, homicidal ideation, intent, or plan.

Mr. Williams presented as alert and fully oriented. He knew who and where he was. Mr. Williams evidenced no significant deficits in attention, memory, or concentration, as he was able to recall essential elements of the so-called "Lamb warning." His thoughts were logical, coherent, and goal directed. Mr. Williams did not appear internally preoccupied and demonstrated no signs of thought blocking or a formal thought disorder. Mr. Williams evidenced no overt delusional ideation. That is, he did not appear to have any false, fixed, irrational beliefs. He denied experiencing any psychotic symptomatology such as auditory hallucinations or visual hallucinations, believing that he can read other peoples' mind or that people could either hear his thoughts and/or steal them.

**CLINICAL IMPRESSION REGARDING NEED FOR CARE AND TREATMENT:** In my clinical opinion, Mr. Williams does not presently suffer from a mental illness as defined by relevant Department of Mental Health regulations. It is my opinion and that of his clinical treatment team that Mr. Williams does not require continued inpatient psychiatric hospitalization at this time. It is my opinion that the behaviors precipitating his transfer to BSH were more a function of his maladaptive personality style and desire to affect a transfer to Shattuck Hospital for psychiatric care, improve his chances for parole, and avoid possible sanctions at Worcester. Therefore, it is recommended that Mr. Williams be returned to Worcester at this time. While it is likely that he has difficulty coping with situational stressors in jail (e.g., receiving a D-Board), it is my opinion that he can be safely managed in a penal environment at this time as he has during previous periods of incarceration. Until just a few days ago, Mr. Williams repeatedly stated that he is not "seriously mentally ill," nor required the strict security of BSH.

In my clinical opinion, Mr. Williams has severe underlying character pathology best characterized as Antisocial Personality Disorder marked by borderline features. His maladaptive personality style often contributes to his disruptive, deceptive, and provocative behavior. Specifically, he has a pattern of behaving and relating to others in an entitled manner in which he often threatens self-harm and/or engages in self-injurious behaviors when his needs and desires are not met. Mr. Williams has poor frustration tolerance and copes poorly when he perceives that his needs are not being met or if he feels that he has been wronged. While at BSH, there has been no deterioration in his mental status, further suggesting the predominance of his maladaptive personality style versus acute symptoms of mental illness.

**BRIDGEWATER STATE HOSPITAL**                                          9

**WILLIAMS, Todd**                                                 **BSH #M90612**

---

**18(a) EVALUATION**

July 1, 2005                                              Gregg A. Belle, Ph.D.

In my clinical opinion, Mr. Williams does not presently meet statutory criteria for involuntary psychiatric commitment. He has had no transfers to the ITU and has not engaged in any suicidal or self-injurious behaviors during his Bridgewater State Hospital admission suggesting that he has the volitional capacity to refrain from engaging in such behaviors.

Given Mr. Williams' maladaptive personality style, difficulty accepting when things do not go as he hopes, and possible sanctions at Worcester, it is likely that he will continue to engage in threatening, disruptive, and provocative behaviors upon return to jail. It is recommended that if he engages in these types of behaviors and/or engages in parasuicidal behaviors that he be assessed at that time by mental health staff to determine whether his mental status has changed. If mental health staff determines that his clinical status remains unchanged and that his behavior is still deemed not to be the result of a mental illness, then his behavior can be managed through behavioral interventions (e.g., security watch or restrictions placed on his privileges). It is my opinion that responding to such parasuicidal behaviors by transferring him to a psychiatric hospital is likely to be counterproductive and result in an increase of these parasuicidal and manipulative behaviors.

These recommendations and concerns have been discussed with Sandy Fallon, LICSW, Mental Health Director at Worcester.


*Karen D. Towers, J.D., Ph.D. for*

**Gregg A. Belle, Ph.D.**
**Designated Forensic Psychologist**

# Bridgewater State Hospital
# Case Management
# Patient Transfer Summary

Name: Williams, Todd          BSH ID#: M90612          Date: 7/01/05

DOB: 11/10/77                 DOC Commitment #: N/A

Admission Date: 6/06/05       Received From: Worcester H/C

Discharge Date: 7/05/05       Returned To:  Worcester H/C

**Reason for Admission:** Referred by Dr. Bluestone due to a hanging attempt on 6/04/05, depressed mood, restricted affect, impaired sleep, hallucinations, and suicidal ideation.

**Institutional Adjustment (Copies of incident reports attached):** Subject has resided on the B-2 minimum orientation unit for the majority of his stay at BSH. On 6/13/05 subject had a visit from his mother who required medical attention during his visit. Subject was transferred to the more secure B-1 unit for a couple of days before being moved back to the B-2 unit for the remainder of his stay.

**Program Participation:** None noted.

**Enemies:** None noted.

**Discharge Plan:**
1. Discharge to Worcester H/C to serve sentence.
2. Meet with Mental Health staff when needed.
3. Take medication as prescribed.

CPO Signature: _____          Date: 7-1-05

Reviewed By: _____             Date: 7-1-05

CC:    6 Part Folder
       BSH Record

# Office of the Sheriff - Worcester County

## Progress Notes

Patient's Name _Todd Williams_    I.D. Number _S1 50 761_    DOB _11 10 77_

| Date | Time | Notes | Signature |
|------|------|-------|-----------|
| 9/6/05 | | Talked with Meaghan O'Connell at DMH - | |
| | | Heidi DeLeon - eligibility specialist felt he was mostly anti-social personality disorded. His report does not show functional impairment that qualifies for DMH. She suggested that if he goes to TX after release if the Theaters felt he may need DMH they could then do an application to see if he could be eligible. | |
| | | _Sandra Fuller LICSW BCD_ | |

**Todd Williams**
**DOB 11/10/77**
**Date of interview: 8/10/05**

Todd is currently serving a one year sentence at the Worcester HOC for impersonating an officer. His wrap date as of 8/11/05 is 12/22/05. He has another open case at Worcester District Court for practicing medicine under a false name. His next court date is 8/22/05. Todd explained that he wrote a prescription for someone and signed a Doctors name. Todd was incarcerated for the first time in 1998.

Todd is currently taking Remeron Cogentin and Trilafon (to help with disorganized thoughts). Prior to incarceration, Todd's Primary Care Physician prescribed him Selexa to help with controlling mood swings. Todd said that he was not consistent with medications and sometimes his husband had to remind him to take it. Todd has never been diagnosed by a psychiatrist, but reports that he is bipolar, has PTSD, anxiety, and gender identify disorder. During Todd's initial mental health screening on 5/24/05, Steve Bisson recorded that Todd had an Axis I diagnosis of PTSD, r/o anxiety disorder NOS, and R/O Bipolar disorder NOS. Without meds, Todd reports that he feels hopeless, worthless, and he isolates himself. He also reports the he goes into fits of rage without medication.

Todd reports that he has tried to commit suicide by hanging himself. Most recently on June 4, 2005. Todd reports that he hears the voice of his dead aunt who passed away while he was incarcerated, telling him that "its time to go" and that he should kill himself. Todd reports that he sees his aunt and he has heard her voice for 4-5 years. He reports that his aunt was a DMH client.

Todd reports that he recalls always feeling hopeless since he was young. Todd reports that his mother's boyfriend physically and sexually abused him. Todd does not speak with his older brother and has little communication with his mother, although she has visited him while he was at the HOC. His mother currently resides in Worcester. Todd reports that he was in the custody of DSS growing up from the age of 7-18. During this time, he had one hospitalization at Providence Hospital when he was 12 years old. Todd reports that he was on the locked unit, but he does not remember why he was there. HE thinks it had to do with DSS [putting him there. Todd also went to court ordered counseling at Worcester Youth Counseling when he was 10 years old and again when he was 16 years old. Todd reports that in 1996he, went to court ordered outpatient counseling at CHL and saw Howard Blank (sp?).

Todd is married to his husband and they have been together since 2000, and were married in 2004. HOC records indicate that Todd has said that they are in the process of divorce. Todd says that his husband is very violent and has physically abused him. Todd reports that his husband is currently in counseling to help with his anger. Todd's husband has not visited him while at the HOC. They own a home together in East Boston. Todd

reports that he dresses in drag and he only socially drinks when he goes out to clubs or parties. Todd denies any other substance abuse.

Todd reports that he graduated from Northeastern with a BS in Nursing and that he was a nurse manager at Mass General Hospital where he worked from 2001-2005. He said he also worked part time at Stop and Shop. Todd received health insurance (Mass general Blue) through his work.

Todd has never applied for DMH. Todd wants a DMH residential program where he can receive behavior therapy, and eventually move back to east Boston. He would like a program in the East Boston area. Todd also wants to apply for MassHealth.

Todd's CM at the jail is Kerri Boutwell x2261. FTT will inform her of housing needs and have her complete a Mass health application and a referral to the reintegration program. FTT explained DMH services, application process. Todd is willing to go into a non DMH program, go into counseling, and then have a clinician fill out the DMH application post release.

Todd denies any sex offenses or violent assaults in his record.